This Opinion Is a
Precedent of the TTAB

Hearing: January 23, 2024            Mailed: April 12, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Sage Therapeutics, Inc.*
*v.*
*SageForth Psychological Services, LLC*

_____

Opposition No. 91270181

Lisa M. Tittemore, Katherine W. Soule and Raina S. Jacques of Sunstein LLP, for Sage Therapeutics, Inc.

Thomas Dunlap, Alex Butterman, Wil Flachsbart and Michael Shafer of Dunlap Bennett & Ludwig PLLC, for SageForth Psychological Services, LLC.

_____

Before Adlin, Thurmon and Lebow, Administrative Trademark Judges.

Opinion by Thurmon, Administrative Trademark Judge:

SageForth Psychological Services, LLC ("Applicant") seeks registration on the Principal Register of the standard character mark SAGEFORTH for the services listed below in International Class 44:[1]

---

[1] Application Serial No. 88881642 was filed April 21, 2020, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's allegation of a bona fide intention to use the mark in commerce.

Psychological consultation; Psychological testing; Psychotherapy services; Psychological assessment services for children, adolescents, adults, and families; Psychological services, namely, providing diagnostic and psychotherapy services to children, adolescents, adults, and families; Family psychotherapy and group psychotherapy; Psychological assessments, namely, personality assessments for psychological purposes, school admissions testing, psychoeducational testing for diagnostic and treatment purposes; Pre-operative psychological assessments; Addiction treatment services in the field of medication abuse, technology addictions, substance use and substance abuse, and food addictions; Anti-smoking and anti-vaping therapy; Art therapy; Mental health counseling and psychotherapy as it relates to relationships. Social skills psychotherapy. Psychotherapy and psychotherapy counseling for children and adults in individual, group, and family sessions; Play therapy; Providing information in the field of psychological counseling, assessments, diagnosis, and treatment; Stress reduction therapy; coping skills therapy; Psychological services, namely, providing therapeutic services to children and their families; Mental health assessments; School admissions psychological testing; private school admissions psychological testing.

Sage Therapeutics, Inc. (Opposer"), opposes registration based on its alleged priority in, and likelihood of confusion with, the six registered marks shown below.[2]

---

[2] 1 TTABVUE (Notice of Opposition). When we cite to the record, we refer to TTABVUE, the Board's docketing system, by docket entry and page number of the downloaded document (e.g., 18 TTABVUE 14).

| Mark | Registration No. | Goods or Services |
|---|---|---|
| SAGE CENTRAL | 6148701 | Providing health and medical information about postpartum depression and treatment; patient support services relating to the treatment of postpartum depression, namely, providing a web site for medical professionals and patients featuring information relating to postpartum depression; patient support services, namely, pharmaceutical advice and consultation in the nature of providing online medical information regarding postpartum depression and treatment, in International Class 44[3] |
| ⊙SAGE THERAPEUTICS<br><br>"Therapeutics" disclaimed | 4879416 | Pharmaceutical research and development services, namely, research and development of pharmaceuticals to treat central nervous system disorders, in International Class 42[4] |
| ⊙SAGE THERAPEUTICS<br><br>"Therapeutics" disclaimed | 5891689 | House mark for pharmaceutical preparations in International Class 5[5] |
| SAGE THERAPEUTICS<br><br>"Therapeutics" disclaimed | 6300552 | House mark for pharmaceutical preparations in International Class 5[6] |

[3] Registration No. 6148701, issued on September 8, 2020. The mark is registered in standard characters.

[4] Registration No. 4879416, issued on January 5, 2016; a Section 8 declaration has been accepted. The word "THERAPEUTICS" is disclaimed. The mark is described as follows: "The mark consists of the words 'SAGE THERAPEUTICS', to the left of which appears an image of a solid circle enclosed in a larger incomplete circle." Color is not claimed as a part of the mark.

[5] Registration No. 5891689, issued on October 22, 2019. The word "THERAPEUTICS" is disclaimed. The mark is described as follows: "The mark consists of the words 'SAGE THERAPEUTICS', to the left of which appears an image of a solid circle enclosed in a larger incomplete circle." Color is not claimed as a part of the mark.

[6] Registration No. 6300552, issued on March 23, 2021. The word "THERAPEUTICS" is disclaimed. The mark is registered in standard characters.

| Mark | Registration No. | Goods or Services |
|---|---|---|
| Sage Therapeutics<br><br>"Therapeutics" disclaimed | 6365035 | House mark for pharmaceutical preparations in International Class 5[7] |
| Sage Therapeutics<br><br>"Therapeutics" disclaimed | 6435109 | House mark for pharmaceutical preparations in International Class 5.[8] |

Applicant denies the salient allegations in the Notice of Opposition, raises certain defenses that were not pursued at trial and brings a counterclaim under Section 18 of the Trademark Act, 15 U.S.C. § 1068, for partial cancellation of the last four registrations shown above. These four registrations identify identical goods, namely, that the registered mark is a "house mark for pharmaceutical preparations," and Applicant seeks restriction of each registration to a "house mark for pharmaceutical preparations that treat post-partum depression."[9]

The case is fully briefed and a hearing was held on January 23, 2024. We sustain the opposition based solely on the registration for the SAGE CENTRAL mark because

---

[7] Registration No. 6365035, issued on May 25, 2021. The word "THERAPEUTICS" is disclaimed. The mark is described as follows: "The mark consists of three intersecting curved shapes to the left of the words 'Sage Therapeutics', where 'Sage' appears above the word 'Therapeutics'." Color is not claimed as a feature of the mark.

[8] Registration No. 6435109, issued on May 22, 2018. The word "THERAPEUTICS" is disclaimed. The mark is described as follows: "The mark consists of three intersecting curved ships in the colors orange, light purple, and blue, to the left of the black stylized words 'SAGE THERAPEUTICS'. The colors orange, light purple, blue and black are claimed as a feature of the mark.

[9] 13 TTABVUE 14-17 (Amended Answer and Counterclaim).

that registration identifies services that partially overlap with those identified in the opposed Application. We do not reach, therefore, the question of whether a likelihood of confusion exists between Opposer's other pleaded marks and Applicant's SAGEFORTH mark. *See, e.g., In re Max Cap. Grp. Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010).

As Applicant notes in connection with its Section 18 counterclaim, the "Board has required that proposed restrictions avoid a likelihood of confusion." Because we do not address the likelihood of confusion between Applicant's mark and the four registrations challenged through the counterclaim, it is not possible for a decision on the counterclaim to avoid a likelihood of confusion finding in this proceeding. The counterclaim, therefore, is moot and is dismissed without prejudice.

## I. The Record

Before we identify the evidence in the record, we must address the extensive lists of objections presented by the parties.[10] We have carefully reviewed those objections, and find most of them baseless.[11] We are well aware of the limits on the probative value of various types of evidence. It is not our practice to wholly exclude, as opposed

---

[10] Opposer submitted sixteen single-spaced pages—roughly the equivalent of thirty-two pages of a brief—of objections to the evidence Applicant submitted. 32 (confidential)/33 (public) TTABVUE 47-62. Applicant, not to be outdone, submitted thirty pages of objections and responses to objections. 34 (confidential)/35 (public) TTABVUE 57-86.

[11] By way of example, Opposer begins its epic list of objections by pointing out that Dr. Vanlandingham, owner of Applicant, provided a testimonial declaration that is not entirely factual. Dr. Vanlandingham included argument and advocacy in her declaration and Opposer spent ten pages, single-spaced, explaining that to the Board. 32 (confidential)/33 (public) TTABVUE App. A, 1-10. Such lengthy, detailed objections to evidence that clearly contains both admissible factual testimony and inadmissible argument are not helpful to the Board.

to discount, questionable evidence. We have taken all objections into account and have given the evidence of record the weight it warrants.

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of Applicant's application.[12] In addition, Opposer submitted the following evidence:

- Printouts from the USPTO's Trademark Status and Document Retrieval (TSDR) electronic database records showing the current status and title of Opposer's pleaded Registrations and a pending application filed by Opposer;[13]

- Copy of the Certificate of Amendment of Certificate of Incorporation of Opposer;[14]

- Excerpts from the Rule 30(b)(6) deposition of Applicant;[15]

- Excerpts from Applicant's discovery responses;[16]

- Exhibits 6-7, 9-12 from the Rule 30(b)(6) deposition of Applicant;[17]

- Internet screenshots from Opposer's websites;[18]

- Excerpts from Opposer's social media pages;[19]

- Copies of press releases issued by Opposer;[20]

---

[12] It was unnecessary for Applicant to submit another copy with its notice of reliance.

[13] 17 (confidential)/18 (public) TTABVUE 13-111.

[14] *Id.* at 124.

[15] *Id.* at 126-222.

[16] *Id.* at 224-31.

[17] *Id.* at 233-85.

[18] *Id.* at 287-338.

[19] *Id.* at 340-88.

[20] *Id.* at 390-437.

- Copy of an article from the PSYCHOLOGY TODAY website;[21]

- Copies of articles concerning psychotherapy and medication to treat mental health conditions;[22]

- Internet screenshots from the website of the American Psychological Association concerning treatments for certain mental health conditions;[23]

- Internet screenshots from the websites mmhla.org, nami.org, and postpartum.net;[24]

- Opposer's Supplemental Notice of Reliance on USPTO, court and other records relating to the enforcement of Opposer's SAGE mark;[25] and,

- Testimony of Dr. Albert Robichaud, Opposer's Chief Scientific Officer, with exhibits.[26]

Applicant submitted the following evidence:

- Applicant's first Notice of Reliance on materials relating to prior trademark disputes involving Opposer;[27]

- Applicant's second Notice of Reliance on excerpts from the Rule 30(b)(6) deposition of Opposer;[28]

- Applicant's third Notice of Reliance on Internet screenshots from the U.S. Food and Drug Administration (FDA) website concerning treatment of certain mental health conditions;[29]

---

[21] *Id.* at 439-42.

[22] *Id.* at 444-61, 468-84.

[23] *Id.* at 463-66.

[24] *Id.* at 486-526.

[25] 29 TTABVUE.

[26] 30 (confidential)/31 (public) TTABVUE.

[27] 19 (confidential)/20 (public) TTABVUE.

[28] 21 (confidential)/22 (public) TTABVUE.

[29] 23 (confidential)/24 (public) TTABVUE.

- Applicant's fourth Notice of Reliance on third-party registrations, third-party Internet evidence, dictionary definitions and an article about the medicinal properties of the herb sage;[30]

- Applicant's fifth Notice of Reliance on USPTO third-party registration records;[31]

- Applicant's sixth Notice of Reliance on USPTO and Internet evidence regarding the goods and services offered by large U.S. pharmaceutical companies;[32] and

- Testimony of Dr. Sarah Mahnaz Vanlandingham, owner of Applicant.[33]

The parties also submitted a stipulation to the admission of a press release from Opposer concerning a newly-approved pharmaceutical.[34]

## II.  Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action must be established in every inter partes case. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020). A party in the position of plaintiff may oppose an application where such opposition is within the zone of interests protected by the statute, 15 U.S.C. § 1063, and the opposer must have a reasonable belief in damage that is proximately caused by registration of the mark. *See Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, at *6 (citing *Corcamore*, 2020 USPQ2d 11277, at *6-7); *see also Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control*

---

[30] 25 TTABVUE.

[31] 26 TTABVUE.

[32] 27 TTABVUE.

[33] 28 TTABVUE.

[34] 36 TTABVUE.

*Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067 n.4 (2014)); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014).

Opposer has made of record its six pleaded registrations, which are active.[35] This establishes its entitlement to bring its Section 2(d) claim against Applicant. *See, e.g., Australian Therapeutic*, 2020 USPQ2d 10837, at *3; *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (pleaded registrations "suffice to establish … direct commercial interest"; a belief in likely damage can be shown by establishing a direct commercial interest); *Barbara's Bakery, Inc. v. Landesman*, 82 USPQ2d 1283, 1285 (TTAB 2007) (opposer's entitlement to opposition established by pleaded registration and non-frivolous likelihood of confusion claim).

## III.    Law and Analysis – Section 2(d)

Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), prohibits registration of a mark that "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent or Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods [or services] of the applicant, to cause confusion, or to cause mistake, or to deceive." To prevail on its Section 2(d) claim, Opposer must show by a preponderance of the evidence that it has either a registration of or priority in its SAGE CENTRAL mark, and that Applicant's use of its mark is likely to cause

---

[35] 17 (confidential)/18 (public) TTABVUE 13-111 (status and title records for Opposer's pleaded Registrations).

confusion, mistake, or deception regarding the source of the services identified in its Application. *New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *2-3 (TTAB 2020).

### A. Priority

Because Opposer's pleaded registrations are properly of record and because Applicant did not counterclaim to fully cancel any of them, priority is not at issue with respect to the registered marks and the goods and services identified in the registrations not subject to the Section 18 counterclaim. *Nkanginieme v. Appleton*, 2023 USPQ2d 277, at *4 (TTAB 2023) (citing *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110-11 (CCPA 1974)). Applicant filed a counterclaim under Section 18 for partial cancellation of four of Opposer's six pleaded registrations, but that counterclaim, even if granted, would not eliminate any of the pleaded registrations, as it seeks to restrict, rather than fully cancel, the four challenged registrations. We note, too, that our decision to sustain the Opposition is based on the registration for the SAGE CENTRAL mark, a registration that is not subject to Applicant's partial cancellation counterclaim. Priority, therefore, is not at issue.

### B. Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont* factors"); *see also In re Majestic Distilling Co.,* 315 F.3d

1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We must consider each *DuPont* factor for which there is evidence and argument. *See, e.g., In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019).

Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *See Citigroup Inc. v. Cap. City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1260 (Fed. Cir. 2011) ("Not all of the *DuPont* factors are necessarily 'relevant or of equal weight in a given case, and any one of the factors may control a particular case.'"); *In re Shell Oil Co.*, 992 F.2d 1204, 1209, 26 USPQ2d 1687, 1688 (Fed. Cir. 1993) ("[T]he various evidentiary factors may play more or less weighty roles in any particular determination."). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and services. *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

As we explained above, our likelihood of confusion analysis will be limited to Applicant's SAGEFORTH application and Opposer's SAGE CENTRAL registration.

### 1. Similarity of the Marks

We consider the marks in their entireties as to appearance, sound, connotation and commercial impression. *See, e.g., Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) (citing *DuPont*, 177 USPQ at 567). "Similarity in any one of these elements may

be sufficient to find the marks confusingly similar." *In re Inn at St. John's LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018) (citing *In re Davia*, 110 USPQ2d, 1810, 1812 (TTAB 2014)), *aff'd per curiam*, 777 F. App'x 516 (Fed. Cir. 2019); *accord Krim-Ko Corp. v. Coca-Cola Bottling Co.*, 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.") (citation omitted).

"The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning, LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012). The focus is on the recollection of the average purchaser, who normally "retains a general rather than a specific impression of marks." *In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1630 (TTAB 2018).

Applicant's mark is SAGEFORTH, which combines the words "sage" and "forth" into a term that has no established meaning. The parties have noted the word "sage" is used as a reference to wisdom or wise advice, which could be suggestive, perhaps, of some of the therapy services identified by Applicant.[36]

The SAGE CENTRAL mark consists of two words. Given the informational services provided under this mark, it is likely the word "sage" will be given a similar

---

[36] 17 (confidential)/18 (public) TTABVUE 141 (from the Rule 30(b)(6) deposition of Applicant) ("And so with SageForth, I wanted to, again, come up with a word that encompassed moving forward with knowledge, with -- with wisdom."); 30 (confidential)/31 (public) TTABVUE 11-12 (from the testimony declaration of Dr. Robichaud, Chief Scientific Officer of Opposer) ("the name was chosen because Sage typically was – was used to refer to somebody who is knowledgeable or was somebody who people went to for advice.").

meaning to the "sage" element of Applicant's mark. "Central" typically refers to a single location, so SAGE CENTRAL may suggest an easy-to-find place for obtaining wise guidance concerning certain mental health conditions.

The marks are visually similar, as both begin with the word "sage." We have noted in other decisions that consumers are more likely to notice and remember the first elements of a trademark, and we find the common "sage" element of these marks is dominant in both of them. *See In re Denisi*, 225 USPQ 624, 624 (TTAB 1985); *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1049 (Fed. Cir. 2018) (finding "the identity of the marks' two initial words is particularly significant because consumers typically notice those words first"); *Palm Bay Imps.*, 73 USPQ2d at 1692; *Presto Prods., Inc. v. Nice-Pak Prods. Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered").

The second elements of the marks are different, and some consumers may notice and recall the difference. But the marks share the same structure, starting with the dominant "sage" element and then add a second word to create a sage-formative mark. This structure results in marks that look like variations on a "sage" theme. This is important because consumers familiar with the SAGE CENTRAL mark and the services provided under that mark may view the SAGEFORTH mark as an extension of the SAGE CENTRAL mark or as an affiliated branch of the business that provides services under the SAGE CENTRAL mark. The common "sage" element of the marks anchors them in a way to the same theme and creates a risk that

consumers will mistakenly assume connections between the services provided under the marks. This type of similarity increases the likelihood of confusion. *See, e.g.*, *Detroit Athletic*, 128 USPQ2d at 1049 (noting that the two compared marks' identical structure supported the conclusion that confusion was likely).

The marks are also similar in sound, as the first and dominant "sage" element of each mark will sound identical. The marks as a whole sound partially different, but the shared "sage" element will have the same impact when spoken or heard as it does when seen. The risk here is that consumers will believe that Opposer and Applicant are connected because of their shared use of the word "sage," featured so prominently in their marks used for similar services.[37] There is only the argument of Applicant's counsel supporting any other meaning for Applicant's mark, and we find those arguments unpersuasive on this point. *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 76 USPQ2d 1616, 1622 (Fed. Cir. 2005)); *Martahus v. Video Duplication Servs. Inc.*, 3 F.3d 417, 27 USPQ2d 1846, 1849 (Fed. Cir. 1993) ("[M]ere attorney arguments unsubstantiated by record evidence are suspect at best.").

The marks are also similar in meaning and are likely to create similar commercial impressions. The word "sage" dominates the meaning of the marks, as the first element of the SAGE CENTRAL mark, and the "forth" segment of Applicant's SAGEFORTH mark does not add more distinctive or striking content to the mark. Applicant's SAGEFORTH mark does not have an established meaning, but we find

---

[37] *See* analysis of the second *DuPont* factor, *infra.*

the word "sage" will likely affect whatever meaning consumers ascribe to this mark. Similarly, the word "sage" in Opposer's SAGE CENTRAL mark drives the meaning of that mark. The marks conjure up images of a sage person providing information and other services about mental health issues. The commercial impressions, therefore, are also similar.

We find that the marks are similar and this similarity weighs in favor of a likelihood of confusion.

### 2. Similarity of the Services, Trade Channels and Classes of Customers

> The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods [or services] set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods [or services], the particular channels of trade or the class of purchasers to which the sales of goods [or services] are directed.

*Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); s*ee also Stone Lion Cap. Partners, L.P. v. Lion Cap. LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014).[38]

Applicant's identification includes the following: "Providing information in the field of psychological counseling, assessments, diagnosis, and treatment …." This is a broad identification with no limitations on the type of mental health issues it covers. Applicant's services, therefore, include providing information relating to any type of mental health condition that falls within the scope of psychological care. *Monster*

---

[38] We address the second, third and fourth *DuPont* factors in the same section because these factors focus on the sort of goods and services identified in the Application and Registrations.

*Energy Co. v. Lo*, 2023 USPQ2d 87, at \*15-16 (TTAB 2023) ("If an application or registration describes goods or services broadly, and there is no limitation as to their nature, it is presumed that the 'registration encompasses all goods or services of the type described.'") (quoting *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 107 USPQ2d 1167, 1173 (Fed. Cir. 2013)); *Sabhnani v. Mirage Brands, LLC*, 2021 USPQ2d 1241, at \*20 (TTAB 2021) (identifications "are construed to include all goods [or services] of the type identified"); *In re C.H. Hanson Co.*, 116 USPQ2d 1351, 1355 (TTAB 2015) ("Registrant's identification is presumed to encompass all goods of the type described[.]").

While Applicant painted with a broad brush when it identified its information services, Opposer used a more focused approach in its SAGE CENTRAL registration, that includes the following services: "Providing health and medical information about postpartum depression and treatment …." The parties agree that psychological conditions are treated with therapy and medication.[39] The services identified in the cited Registration fall entirely within Applicant's broader identification of "providing

---

[39] 28 TTABVUE 20 (Testimony of Dr. Vanlandingham) ("I am well aware that many patients will treat depression with both medicine and psychotherapy and therefore the treatments can be said to be 'complimentary.'"); 30 (confidential)/31 (public) TTABVUE 155-56 (testimony of Dr. Robichaud that mental health patients typically begin treatment with a therapist and that such treatment may later include medication). Complementary goods and services are typically found to be related. *See, e.g.*, *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984) (bread and cheese); *Gen. Mills, Inc. v. Fage Dairy Processing Indus. SA*, 100 USPQ2d 1584, 1597-98 (TTAB 2011), judgment set aside on other grounds, 110 USPQ2d 1679 (TTAB 2014) (cereal and yogurt); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1272 (TTAB 2009) (medical magnetic resonance imaging diagnostic apparatus and medical diagnostic apparatus, namely, medical ultrasound device); *In re Vienna Sausage Mfg. Co.*, 230 USPQ 799 (TTAB 1986) (sausage and cheese).

information about psychological … treatment."[40] The services, therefore, are legally identical in part.[41] *In re Info. Builders Inc.*, 2020 USPQ2d 10444, at *3 (TTAB 2020) ("Applicant's more broadly defined computer software and Registrant's computer software essentially serve the same function and purpose and, therefore, are goods that are legally identical in part."); *In re Hughes Furniture Indus., Inc.*, 114 USPQ2d 1134, 1137 (TTAB 2015) ("Applicant's broadly worded identification of 'furniture' necessarily encompasses Registrant's narrowly identified 'residential and commercial furniture.'"). The identical nature of the goods also weighs in favor of a likelihood of confusion.

With respect to similarity of the established trade channels through which the services reach customers, we presume identical services move in the same channels of trade and are available to the same classes of customers for such services—here, consumers who seek information about postpartum depression and other mental health issues.[42] *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed.

---

[40] Applicant brought a counterclaim to narrow the identification of goods in four of Opposer's pleaded Registrations, but it did not seek to amend its own identification. It is somewhat ironic that the overlap in the services noted above is largely a result of the broad identification of information services in the opposed application. Applicant chose that broad wording and now faces the consequences of that decision.

[41] It is sufficient for a finding of likelihood of confusion if relatedness is established for any item encompassed by the identification of goods or services within a particular class in the application. *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986 (CCPA 1981); *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1745 (TTAB 2014). In other words, it does not matter that the Application identifies other services in International Class 44 that are less similar to the services identified in the SAGE CENTRAL registration.

[42] The parties agree that almost all consumers are prospective customers of mental health services. Applicant's "typical consumers … are children, families and parents, who are seeking psychological testing and/or therapy for a variety of psychological difficulties and disorders." 17 (confidential)/18 (public) TTABVUE 228 (Applicant's response to Interrogatory No. 8). Opposer expects its information services to have broad reach, as well. *See* 30

Cir. 2012) ("[I]t is well established that, absent restrictions in the application and registration, [identical] goods and services are presumed to travel in the same channels of trade to the same class of purchasers.") (internal quotation marks and citation omitted); *In re FabFitFun, Inc.,* 127 USPQ2d 1670, 1672-73 (TTAB 2018). This presumption applies here because the services are identical in part. The overlapping trade channels weigh in favor of a likelihood of confusion.

Most of Applicant's arguments under these factors are inapposite because of our focus on the SAGE CENTRAL registration. Applicant focused much of its arguments on Opposer's registrations in International Class 5. When Applicant did address the information services it identified, Applicant ignored the broad and unlimited wording in the Application and instead explained that Applicant provides "highly specific and technical information" in its practice.[43] This is the wrong comparison because we cannot read limitations into the identification in the Application, as we explained above. *See, e.g., Monster Energy Co.*, 2023 USPQ2d 87, at *15-16.

Applicant makes the same mistake when it argues that its broadly worded psychological services[44] do not include treating postpartum depression "because Applicant does not treat new mothers and Applicant does not treat depression *per*

---

(confidential)/31 (public) TTABVUE 124-25 ("Sage would consider the consumer base to be any and all patients, family members, physicians, and health care workers associated with the potential use of a medication directed at a particular indication, such as postpartum depression.").

[43] 34 (confidential)/35 (public) TTABVUE 26.

[44] Applicant also includes "psychological consultation, psychological testing, psychological services, psychological assessment services" and other similar variants in its identification of services.

*se.*[45] As we noted above, the details of Applicant's actual practice cannot be used to impose a limitation on the services that is not reflected in the identification in the Application. Nowhere does the Application exclude depression, postpartum depression or any other mental health condition. It is Applicant's own broad wording that creates the overlap in the services.

Applicant also submitted evidence to show that the USPTO has registered allegedly similar marks for similar goods or services.[46] This evidence is not probative. "The Board must decide each case on its own merits." *In re Nett Designs Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) (citing *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985); *see also In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174 (Fed. Cir. 2009) ("Applicant's allegations regarding similar marks are irrelevant because each application must be considered on its own merits."). Moreover, Applicant proposes an incomplete comparison—that is, comparison between "pharmaceutical preparations or nutritional supplements and pharmaceutical research services, on the one hand, and mental health services, on the other hand"—rather than the most obvious comparison between the parties' overlapping information services in the Application and the SAGE CENTRAL registration.

Turning to the purchasing conditions, Applicant argues that Opposer's goods are expensive and that Opposer's postpartum depression treatments require an extended

---

[45] *Id.* at 24.

[46] *Id.* at 29 (citing 26 TTABVUE).

process that will reduce the risk of confusion.[47] These arguments mostly miss the point because we are evaluating the likelihood of confusion between the SAGE CENTRAL mark and Applicant's SAGEFORTH mark for providing information to consumers. The information services provided under the SAGE CENTRAL mark via a website are free and may be used by family or friends of the patient or simply by interested members of the public.

Applicant argues that its services are provided "over long periods of time and [through] detailed one-on-one work with patients and their families, school, and other stakeholders."[48] While this may be true for Applicant's therapy services, Applicant's website provides information about its services and the range of conditions Applicant treats.[49] These are information services of the type identified in both the Application and the SAGE CENTRAL registration. Moreover, access to this information via Applicant's website is free and available to anyone, just as it is on Opposer's website. Because our focus is on the overlapping information services, we must consider the lowest possible degree of customer care required to acquire those services (i.e., searching and browsing the Internet), not the other services identified in the Application or the pleaded Registrations. We find the purchasing conditions and customer care factor is neutral in our likelihood of confusion analysis.

---

[47] 34 (confidential)/35 (public) TTABVUE 44-45.

[48] *Id.* at 44.

[49] 17 (confidential)/17 (public) TTABVUE 233-61. Of particular note, Applicant's website includes information about a number of mental health issues, especially for children. There is a paper or article written by Dr. Vanlandingham titled Developing Self-Esteem in Children, which is the type of information service at issue in this proceeding. *Id.* at 258-59.

### 3. Strength or Weakness of the Cited SAGE CENTRAL Mark

Under the fifth and sixth *DuPont* factors, "we consider both inherent strength, based on the nature of the mark itself, and commercial strength or recognition." *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1345 (TTAB 2017) (citing *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1476 (TTAB 2014)); *see also In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning)."). The market strength "of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident." *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002). Conversely, the scope of protection may be contracted by adducing evidence of "[the number and nature of similar marks in use on similar goods." *DuPont*, 177 USPQ at 567.

#### a. Conceptual Strength

Applicant argues that the word "sage" is common within the healthcare field and, as a result, the common use of this term is not likely to cause confusion. Before we address the evidence Applicant relies upon for these arguments, we note there is a limit on how far this evidence can be taken. Because the cited Registration of the SAGE CENTRAL mark is "prima facie evidence of the validity of the registered mark," *see* Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b), we must assume the mark is inherently distinctive as evidenced by its registration on the Principal

Register without a claim of acquired distinctiveness under Section 2(f) of the Trademark Act. *See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 17 F.4th 129, 2021 USPQ2d 1069, at *12 (Fed. Cir. 2021); *Tea Bd. of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006); *New Era Cap Co. v. Pro Era, LLC,* 2020 USPQ2d 10596, at *10 (TTAB 2020). Thus, at the very least, we must afford the cited SAGE CENTRAL mark "the normal scope of protection to which inherently distinctive marks are entitled." *Bell's Brewery,* 125 USPQ2d at 1347. Applicant's third-party evidence may be relevant to show where, within the range of inherently distinctive marks, the SAGE CENTRAL mark belongs, but we cannot find the mark merely descriptive given its registration.

If properly made of record, third-party registrations alone may be relevant, in the manner of dictionary definitions, "to prove that some segment of the [marks] has a normally understood and well recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1675 (Fed. Cir. 2015); s*ee also Jack Wolfskin Ausrustung Fur Draussen GmbH v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015); *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693, 694-95 (CCPA 1976) (even if "there is no evidence of actual use" of "third-party registrations," such registrations "may be given some weight to show the meaning of a mark in the same way that dictionaries are used"). "[E]vidence of third-party registrations is relevant to 'show the sense in which . . . a

mark is used in ordinary parlance.'" *In re Guild Mortg. Co.*, 2020 USPQ2d 10279, at *3 (TTAB 2020).

Applicant submitted evidence of third-party registrations of marks and third-party Internet uses of marks that include the word "sage" and that identify some type of health or wellness goods or services.[50] While Applicant refers to the large number of such uses, most of those uses are on different goods or services from those identified in the Application or the SAGE CENTRAL registration, and are, therefore, not probative in this case. *See Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1694 (Fed. Cir. 2018) (error to rely on third-party evidence of similar marks for dissimilar goods, as Board must focus "on goods shown to be similar"); *In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017) (disregarding third-party registrations for other types of goods where the proffering party had neither proven nor explained that they were related to the goods in the cited registration).

In *Omaha Steaks*, the Federal Circuit explained the importance of limiting the scope of the inquiry into third-party uses. *Omaha Steaks*, 128 USPQ2d at 1693-94. The parties in *Omaha Steaks* identified "meat" as their goods, but the third-party evidence included other foods, like popcorn and wine. *Id.* at 1694. Because the identified goods were limited to meat, the court held it was error to consider other registrations for other types of food. *Id.*

---

[50] Response to Office Action dated October 11, 2022 at 17-170.

In this case, the parties' information services are provided to the general public, but those services are limited to mental health information. To be relevant, therefore, third-party evidence must show use in connection with mental health counseling, assessments, diagnosis, or treatment. The health and wellness field is large, and, like in the *Omaha Steaks* case, we must narrow the field of relevant third-party uses and registrations to services that are similar to those offered under the marks at issue in this case.

Applicant provided evidence of fifty-three registrations that include the word "sage" in some form and that identify services in the health and wellness field. The vast majority of these registrations, however, do not identify mental health services and, for that reason, are not probative here. We find that only four of the fifty-three are within the relevant field, and those are shown below.

| Mark | Registration No. | Services (excerpts showing most relevant) |
|---|---|---|
| THREE SAGES | 5853063 | Consulting services in the field of mental health and wellness …, in International Class 44 |
| SAGE TONIC | 5339013 | Downloadable mobile applications for self-treating a variety of physical and mental conditions, in International Class 9 |
| SAGE RECOVERY & WELLNESS CENTER | 5469795 | Counseling in the field of developing, strengthening and sustaining well-balanced families and family relationships; Counseling in the field of personal development, namely, self-improvement, self-fulfillment, and interpersonal communication …, in International Class 45 |

| | | |
|---|---|---|
| **sage** <br> Services and Advocacy for Gay, Lesbian, Bisexual & Transgender Elders | 3713714 | … mental health services in the nature of crisis intervention therapy in the fields for lesbian, gay, bisexual, and transgender senior citizens, in International Class 44; and <br><br> … case management services, namely, coordination of legal, social and psychological services for lesbian, gay, bisexual, and transgender senior citizens …, in International Class 45 |

These are the four registrations identified by Applicant that are closest to the services identified in the Application and the SAGE CENTRAL registration. Three of the four marks have significant design elements, and none of them recite the same information services identified in the Application or the SAGE CENTRAL registration. This evidence shows a few registrations of Sage-formative marks in the mental health field, but not enough to show that the word is conceptually weak within this field.

Applicant's Internet evidence is more probative. It shows fifty-five uses of Sage-formative marks. Of these, we find the following sixteen offer mental health services similar to those provided by Applicant or other mental health goods or services.

- Sage Psychology Group[51]
- Sage Psychology[52]
- Dr. Kim Sage Psychology[53]

---

[51] 25 TTABVUE 148.

[52] *Id.* at 149.

[53] *Id.* at 150.

- Sageview Youth Psychology[54]

- Sage Psychological Service, LLC[55]

- Sage Tree Psychology Group[56]

- Sage Psychological Services[57]

- Hope & Sage Psychological Services[58]

- Sage Neuropsychology Consultants[59]

- SageMind Psychology[60]

- Sage Health Care[61]

- Sage Healthcare[62]

- Sage Health Services[63]

- We Sage mental health[64]

- Sage[65]

- Sage Neuroscience Center[66]

---

[54] *Id.* at 151.

[55] *Id.* at 152.

[56] *Id.* at 154.

[57] *Id.* at 155.

[58] *Id.* at 156.

[59] *Id.* at 157.

[60] *Id.* at 158.

[61] *Id.* at 159.

[62] *Id.* at 163.

[63] *Id.* at 164.

[64] *Id.* at 180.

[65] *Id.* at 190.

[66] *Id.* at 192.

Each of these marks or names is used with some type of mental health goods or services. Most of the examples are individual mental health providers who offer therapy services similar to Applicant and support the conclusion that the word "sage" is somewhat popular among providers of psychological therapy services. Our focus, however, is on information services, not Opposer's pharmaceuticals or research, and not on Applicant's therapy services. Nevertheless, a review of the evidence shows that many of the providers listed above present information on mental health on their websites. The evidence, therefore, shows some weakness of the word "sage" within the field of providing information about mental health.

We cannot determine the scope of the uses by any of the third-parties, as Applicant only submitted screenshots for their websites. All that establishes is that the website exists and presents certain information. Context is critical, and without some evidence showing the likely impact of these third parties, we cannot determine how probative the uses are, either individually or collectively.[67] *See Palm Bay Imps.*, 73 USPQ2d at 1693 ("As this court has previously recognized where the 'record includes no evidence about the *extent of [third-party] uses* … the probative value of this evidence is thus minimal.'") quoting *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1561 (Fed. Cir. 2001). With these limitations in the evidence in mind, we find Applicant's evidence shows the word "sage" is somewhat conceptually weak as a source-identifier within the mental health field.

---

[67] By way of comparison, in *Juice Generation*, there were at least twenty-six relevant third-party uses or registrations of record, 115 USPQ2d at 1672 n. 1, and in *Jack Wolfskin*, there were at least fourteen, 116 USPQ2d at 1136 n.2.

Applicant's third-party evidence only moves the balance so far, because, as we noted above, we must treat the SAGE CENTRAL mark as inherently distinctive. Given the evidence of record, we find the word "sage" is suggestive of the services Opposer provides under that mark. The SAGE CENTRAL mark suggests a central location for obtaining wise advice. The mark is less conceptually strong than an arbitrary mark, but suggestive marks are inherently distinctive and entitled to protection. *Maytag Co. v. Luskin's, Inc.*, 228 USPQ 747, 750 (TTAB 1986) ("there is nothing in our trademark law which prescribes any different protection for suggestive, nondescriptive marks than that which is accorded arbitrary and fanciful marks"); *In re Great Lakes Canning, Inc.*, 227 USPQ 483, 485 (TTAB 1985) ("the fact that a mark may be somewhat suggestive does not mean that it is a 'weak' mark entitled to a limited scope of protection").

### b. Market Strength

According to the Federal Circuit, a mark has market strength where "a significant portion of the relevant consuming public … recognizes the mark as a source indicator." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (citing *Palm Bay Imps.*, 73 USPQ2d at 1694). Opposer argues its SAGE CENTRAL mark is "*famous* to the general consuming public for the purposes of a likelihood of confusion analysis."[68] (emphasis in original.) For purposes of a likelihood of confusion analysis, our inquiry focuses on "a mark's

---

[68] 36 TTABVUE 29 (emphasis in original).

renown within a specific product market [as] the proper standard." *Joseph Phelps Vineyards,* 122 USPQ2d at 1734.

Opposer argues that its SAGE marks are well-known within its market. Opposer points to evidence that it has received media attention for its new postpartum depression pharmaceuticals in medical industry and venture capital publications.[69] While this evidence may show that Opposer is known to investors and medical professionals involved in treating postpartum depression, and perhaps other related mental health conditions, it does not show that consumers are aware of its SAGE marks. Indeed, Opposer's first FDA-approved medication was released in 2019. Prior to that time, the only consumer interactions with Opposer's SAGE marks occurred in the course of clinical trials.[70] These are uses in commerce, but a use during a clinical trial will only reach a small segment of the universe of potentially relevant consumers. With regard to the third-party uses discussed above, they are not sufficiently probative to contract the scope of protection based on commercial weakness.

### c. Conclusion

To summarize our findings under the fifth and sixth *DuPont* factors, the evidence does not show commercial strength or weakness of the SAGE CENTRAL mark, and we find the mark is suggestive. The evidence shows some conceptual weakness of "sage" as a source identifier for providing information in the field of mental health

---

[69] 32 (confidential)/33 (public) TTABVUE 44 (citing media mentions).

[70] 21 (confidential)/22 (public) TTABVUE 83 (testimony by Dr. Robichaud that Zulresso was Opposer's first FDA-approved medication and that it was approved on March 19, 2019).

services, but as a registered mark, the SAGE CENTRAL mark is entitled to the presumptions of validity under Section 7(b). We, therefore, accord the mark SAGE CENTRAL the protection of a suggestive mark.

### C. Other *DuPont* Factors

Applicant argues, under the thirteenth *DuPont* factor, that Opposer has engaged in a pattern of bad faith enforcement of its trademark rights. In support of this argument, Applicant points to other trademark disputes between Opposer and third-parties.[71] But these are all instances of Opposer's efforts to enforce its trademark rights. That is not evidence of bad faith. Indeed, Applicant cites no authority in support of its novel arguments here. We treat the thirteenth *DuPont* factor as neutral.

### D. Conclusion – Confusion is Likely

We have considered all *DuPont* factors for which there is argument or evidence. The marks are similar and the services are legally identical in part. We must presume that the trade channels and classes of consumers overlap. The first three *DuPont* factors, therefore, all point toward a likelihood of confusion, with the first two factors weighing more heavily than the third, based on the record here. The fourth factor is neutral.

Under the fifth and sixth *DuPont* factors, the evidence does not show that the SAGE CENTRAL mark has restricted or enhanced market strength but does show that itis somewhat suggestive. We find the conceptual suggestiveness does not

---

[71] 34 (confidential)/35 (public) TTABVUE 46.

outweigh the other factors. Applicant's arguments under the thirteenth *DuPont* factor lack merit, and we consider the factor neutral.

When we consider all the relevant *DuPont* factors, and assign appropriate weights to the factors, Opposer has proven its Section 2(d) claim by a preponderance of the evidence.

## IV. Applicant's Counterclaim Is Moot

Applicant asks the Board to restrict the identification of goods in the four International Class 5 registrations pleaded by Opposer to a "house mark for pharmaceutical preparations **that treat post-partum depression**." The proposed restriction is in bold, and would substantially limit the range of goods identified in these four registrations. This counterclaim is brought under Section 18 of the Act.

To prevail on the counterclaim, Applicant must prove two elements:

1. the proposed amendment avoids a likelihood of confusion finding; and,

2. the proposed amendment is supported by the evidence of record.

*Wellcome Found. Ltd. v. Merck & Co.*, 46 USPQ2d 1478, 1479 (TTAB 1998) (citing *Eurostar v. "Euro-Star" Reitmoden GmbH & Co. KG*, 34 USPQ2d 1266, 1271 (TTAB 1994)); TBMP § 309.03(d).

In this case, Applicant's Section 18 counterclaim cannot avoid our finding that a likelihood of confusion exists between Applicant's SAGEFORTH mark and Opposer's SAGE CENTRAL registration. We did not rely on any of the four registrations challenged in Applicant's Section 18 counterclaim to sustain the opposition; we relied only on the unchallenged SAGE CENTRAL registration. That means granting the

counterclaim, after having sustained the opposition, would result only in a substantial restriction to four registrations that are not the basis for sustaining the opposition. This would not promote judicial economy. Moreover, deciding the Section 18 counterclaim after sustaining the opposition on other grounds implicates concerns analogous to those considered by the Board in *Eurostar*. We start with a brief review of the changes to Section 18 made over 30 years ago, as explained by the Board in *Eurostar*.

As part of the Trademark Law Revision Act (TLRA) of 1988, Congress amended Section 18, giving the Board greater power to restrict the identification of goods and services in applications and issued registrations. *See generally*, Timothy A. Lemper and Linda K. McLeod, *Embracing Marketplace Realities: Rediscovering Section 18 of the Lanham Act on the Twentieth Anniversary of its Revival*, 99 TRADEMARK REPORTER 1299 (2009). "The amendments to Section 18 were intended to give the Board greater ability to decide cases on the basis of the evidence of actual use." *Eurostar Inc.*, 34 USPQ2d at 1268. "[T]he Office chose, as the mechanism to permit the restriction of a pleaded registration, a counterclaim for partial cancellation." *Id.* at 1269.

In an early decision interpreting the amended Section 18, the Board held that

> the language of Section 18 is broad enough to allow the Board to 'rectify' the register by deleting from the registration asserted by a plaintiff (i.e., an opposer or a cancellation petitioner) specific items of goods on which the plaintiff's mark is no longer used or by modifying or restricting an overbroad statement of plaintiff's ... goods, even where a deletion, modification, or restriction will not avoid a finding of likelihood of confusion.

*Alberto-Culver Co. v. F.D.C. Wholesale Corp.*, 16 USPQ2d 1597, 1604 (TTAB 1990). Four years later, the Board changed course, holding in *Eurostar* "that, in a case involving likelihood of confusion, we should not exercise our authority under Section 18 to permit an action to restrict an application or registration where such a restriction is divorced from the question of likelihood of confusion." *Eurostar*, 34 USPQ2d at 1270. This holding led to the establishment of the two elements for a Section 18 claim recited above.

In *Eurostar*, the petitioner sought partial cancellation of a registration that was cited as a basis for a Section 2(d) refusal of the petitioner's application. That application was suspended while the petition for partial cancellation proceeded. The petitioner alleged that

> for at least the last two years, respondent has not used and, therefore, has abandoned the registered mark for all channels of trade in the United States except for catalog mail order sales and sales through retail establishments specializing in apparel, equipment and products for horses and for owners and/or riders of horses.

*Eurostar*, 34 USPQ2d at 1267. The petitioner sought to restrict the registration to such trade channels. The Board held the petitioner's claim required a showing that the restriction would also avoid the likelihood of confusion finding that was blocking petitioner's application. Petitioner was given time to amend.

The Applicant in this proceeding conceded in its brief that, "[s]ince Eurostar, this Board has required that proposed restrictions avoid a likelihood of confusion."[72] When

---

[72] 40 TTABVUE 12.

asked during the hearing whether its counterclaim would be moot if we sustain the opposition on the unchallenged SAGE CENTRAL registration, Applicant's counsel agreed. There is, it seems, no dispute in this proceeding that the Section 18 counterclaim cannot avoid the likelihood of confusion finding we made to sustain the opposition, and we therefore see no purpose in addressing it now.

On the other hand, Opposer did assert those registrations in support of its likelihood of confusion claim against Applicant. And because we resolve only questions regarding the right to registration, and not the right to use a mark, it remains possible that Opposer here might assert the same four registrations in an infringement proceeding challenging Applicant's use of its mark. In that scenario, we see no reason why Applicant should not retain the right to bring a counterclaim against any of the registrations asserted against it, which could include the four house mark registrations it challenged through its counterclaim in this proceeding. For that reason, we dismiss the counterclaim **without prejudice**.

To put a finer point on it, when a Section 18 counterclaim seeks to restrict registrations that were not relied upon in the Board's decision on the primary claim, the counterclaim would require the Board to conduct a full likelihood of confusion analysis between the challenged registrations and the applicant's mark. If we found a likelihood of confusion in that process, we would then need to repeat that analysis based on the proposed amendment to the identifications in the four challenged registrations. But such analyses would be effectively an advisory opinion on likelihood of confusion, because no substantive consequence would flow from our

conclusions. In this sense, the Section 18 counterclaim here seeks a "restriction [that] is divorced from the question of likelihood of confusion." *Eurostar*, 34 USPQ2d at 1270. We are mindful of the following concerns expressed by the Board in the *Eurostar* decision:

> If the Board were to continue to entertain petitions to restrict registrations where such proposed restrictions have no bearing on the issue of likelihood of confusion, the Board might unwittingly encourage the use of TTAB inter partes proceedings to harass the owners of existing (and, perhaps, long-held) registrations.

*Eurostar*, 34 USPQ2d at 1270. We thus hold that a Section 18 counterclaim should be denied without prejudice if the Board sustains a Section 2(d) opposition based on registrations that are not challenged by the counterclaim. This modest extension of the *Eurostar* holdings is consistent with the policies and concerns behind that decision. Section 18 should not be used to force the Board into conducting likelihood of confusion analyses that cannot have a real impact on the registrability of a mark.

**Decision**: The opposition to registration of Applicant's mark is **sustained** under Section 2(d) of the Act based on Opposer's SAGE CENTRAL registration. Applicant's Section 18 counterclaim is **dismissed without prejudice**.